Taty Lieana Tearsa SAEL, Orville
Wright Manariangkuba,
Petitioners,

v.

John ASHCROFT, Attorney
General, Respondent.

No. 02–71872.

United States Court of Appeals,
Ninth Circuit.

Argued May 13, 2004.

Submitted Oct. 14, 2004.*

Filed Oct. 14, 2004.

* At oral argument, the parties addressed only the jurisdictional issue that we resolve at note two, *infra*. The panel unanimously finds this case suitable for decision without oral argument on the merits. *See* Fed. R.App. P. 34(a)(2).

Robert G. Ryan, Law Offices of Valencia & Wong, San Francisco, CA, for the petitioners.

Jeffrey J. Bernstein and Jamie M. Dowd, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before B. FLETCHER, TROTT, and FISHER, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

Taty Lieana Tearsa Sael ("Sael") and her husband, Orville Wright Manariangkuba ("Manariangkuba"), seek asylum from Indonesia. Immigration Judge ("IJ") Miriam Hayward granted relief, but the Board of Immigration Appeals ("BIA") reversed. We grant the petition for review because Sael, the lead petitioner, has established a well-founded fear of future persecution on account of her Chinese ethnicity. Sael has demonstrated that Indonesians of Chinese descent are a disfavored group and that she is particularly at risk, based on past threats and acts of violence against her.

## I.

Indonesia's ethnic Chinese minority makes up only three percent of the country's population, AR 223, and has been a frequent target of violence throughout its history. Evidence in the record documents anti-Chinese violence dating back to the period of Dutch colonial rule, when ethnic Chinese were segregated from Indonesia's indigenous population. AR 695, 753. Ethnic violence continued after independence, as the Chinese minority came under suspicion for disloyalty as a communist "fifth column." AR 531. More recently, anti-Chinese violence has been fueled by resentment of the Chinese minority's economic power and by religious tensions between Muslims and Chinese Christians. AR 532–34; *see also* AR 218, 221. Human Rights Watch has assessed the anti-Chinese current in Indonesia as drawing on a long history of "severe discrimination" and "[a]nti-Chinese violence." AR 531.

The experiences of Sael's family reflect this history. Sael and her father suffered from discrimination throughout their lives—discrimination that spared Sael's siblings who do not appear Chinese. AR

113, 130–31. Sael was tormented as a young student and later threatened by an anti-Chinese mob that attacked a boarding house where she lived. AR 113–14, 124–27. In 1998, Sael was attacked again by an anti-Chinese mob in Jakarta and by a group of anti-Chinese men in her own Bandung neighborhood. AR 116–20, 122–24. The men vandalized Sael's car and told her that she had "better be careful." AR 124.

Sael and Manariangkuba decided to flee Indonesia after these last two incidents. They entered the United States on August 8, 1998, overstayed their visas, AR 1094, and responded to Notices to Appear by applying for political asylum, withholding of removal, and relief under the Convention Against Torture. Judge Hayward granted the petitioners asylum on March 24, 2000, citing a "pattern and practice" of persecution against ethnic Chinese in Indonesia.[1] AR 60–61. The BIA disagreed with Judge Hayward's "pattern and practice" assessment and reversed. AR 2–3. Sael timely petitioned for review.

■ We have jurisdiction over Sael's petition pursuant to 8 U.S.C. § 1252(a)(2004).[2] Because the BIA issued a reasoned opinion after conducting its own review of the record, we review the BIA's decision for substantial evidence. *See Andriasian v. INS*, 180 F.3d 1033, 1040 (9th Cir.1999). In doing so, we accept Sael's testimony as true. *See Navas v. INS*, 217 F.3d 646, 652 n. 3 (9th Cir.2000) ("Where the BIA does not make an explicit adverse credibility finding, we must assume that the applicant's factual contentions are true.").

## II.

In order to be eligible for asylum, Sael must establish that she is a refugee—a person unable or unwilling to return to Indonesia "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir.2003) (quoting 8 U.S.C. § 1101(a)(42)(A) (1994)). "Persecution encompasses the infliction of suffering or harm upon those who differ in race, religion or political opinion in a way regarded as offensive." *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir.2004) (internal quotation marks omitted).

■ An asylum applicant's well-founded fear of persecution must be both subjectively genuine and objectively reasonable. *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir.1999). An applicant "satisfies the subjective component by credibly testifying that she genuinely fears persecution." *Id.* Sael satisfied this requirement with her credible testimony that she fears being hurt, raped or killed in Indonesia. AR 129. An asylum applicant "generally satisfies the objective component in one of two ways: either by establishing

1. Manariangkuba is not ethnically Chinese. His asylum application is derivative of Sael's. *See Cardenas v. INS*, 294 F.3d 1062, 1068 (9th Cir.2002). Subsequent references to the petitioners will be to Sael.

2. The Attorney General contended at oral argument that Sael's motion for reconsideration, which is currently pending before the BIA, deprives us of jurisdiction. In post-argument briefing, the Attorney General reversed course, citing *Stone v. INS*, 514 U.S. 386, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995), for the proposition that we retain jurisdiction over this appeal. We agree with the government's current position: *Stone* controls, and Sael's pending motion does not affect our jurisdiction. *See Stone*, 514 U.S. at 395, 115 S.Ct. 1537.

We deny Sael's request to hold this appeal in abeyance pending a decision by the BIA on the motion to reconsider.

that she has suffered persecution in the past or by showing that she has a good reason to fear future persecution." *Id.* In this case, Sael relies on a fear of future persecution, not on a showing of past persecution.[3] "Even a ten percent chance that the applicant will be persecuted in the future is enough to establish a well-founded fear." *Knezevic,* 367 F.3d at 1212.

■ An asylum applicant demonstrates a well-founded fear of future persecution in either of two ways. Under the first approach, the applicant relies on establishing "a pattern or practice of persecution of people similarly situated...." *Knezevic,* 367 F.3d at 1213. Alternatively, an applicant may prove that she is a member of a "disfavored group" coupled with a showing that she, in particular, is likely to be targeted as a member of that group. *Mgoian,* 184 F.3d at 1035 n. 4 (internal quotation marks omitted); *see also Hoxha v. Ashcroft,* 319 F.3d 1179, 1182–83 (9th Cir. 2003); *Singh v. INS,* 94 F.3d 1353, 1359 (9th Cir.1996); *Kotasz,* 31 F.3d at 853. The latter claim consists of two elements— membership in a "disfavored group" and an individualized risk of being singled out for persecution—that operate in tandem. Thus, the "more serious and widespread the threat" to the group in general, "the less individualized the threat of persecution needs to be." *Mgoian,* 184 F.3d at 1035 n. 4; *see also Hoxha,* 319 F.3d at 1182–83; *Kotasz,* 31 F.3d at 853–54. Sael's strongest grounds for asylum rest on her showing both the "disfavored status" of ethnic Chinese in Indonesia and that she herself is specifically targeted for persecution.

## A.

Sael has submitted compelling evidence that the ethnic Chinese minority is a "disfavored group" in Indonesia. The voluminous record documents a history of anti-Chinese violence dating as far back as 1740. *See Terror in Chinatown: The Ethnic Chinese in Indonesia Continue to Live in Fear,* The Economist, Aug. 22, 1998, at 31("Indonesia's Chinese are used to mob violence. As long ago as 1740, Chinese immigrants in Jakarta were attacked by a combination of hostile indigenous people and suspicious Dutch administrators.") (AR 695).[4] Anti–Chinese attacks continued after Indonesia achieved its independence; in the 1960s, the ethnic Chinese minority was targeted in what one news account describes as "near genocidal" anti-communist pogroms. *See Indonesia: Why Ethnic Chinese Are Afraid,* BBC News, March 3, 1998,[5] at http://news.bbc.co.uk/1/hi/world/analysis/51981.stm (AR 560). According to Human Rights Watch, anti-Chinese violence accompanied "virtually every outbreak of social and political unrest during President Soeharto's thirty years in power." Human Rights Watch, *Indonesia Alert: Economic Crisis Leads to Scapegoating of Ethnic Chinese* (Feb.1998) [hereinafter *"Indonesia Alert"*], at http://www.hrw.org/press98/feb/indo-al2.htm (AR 531).

Anti–Chinese violence peaked recently in 1998, when more than 1,000 people were

---

**3.** The IJ found that Sael's experiences in Indonesia did not amount to past persecution. AR 59. Sael does not challenge this finding, and we do not address it.

**4.** We note that the news articles and human rights reports referred to in this section were all included in the record submitted to the IJ and BIA.

**5.** The printed copy of this article, found at AR 560, is dated March 3, 1998. However, the URL provided links to a web page dated February 12, 1998. In any case, both the exhibit and the present web page present the same article.

killed and dozens of women raped during a series of bloody riots. *See* Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, Indonesia Country Report on Human Rights Practices for 1998 (Feb. 26, 1999) (citing evidence of rapes and stating that the ethnic Chinese minority "was not protected by the authorities" during the 1998 riots) (AR 877); Human Rights Watch, World Report 1999: Indonesia and East Timor, *at* http://www.hrw.org/worldreport99/asia/indonesia.html (AR 849).[6] In the years since the 1998 riots, the international news media has documented continued tensions, resentment and violence. In at least one instance, ethnic Chinese found their homes marked for destruction, much as they had been before the 1998 violence. *See Bali's Ethnic Chinese Living in State of Fear,* The Jakarta Post, Feb. 6, 2000 (AR 266). Chinese Christian churches and homes have also been attacked in a violent merger of religious and ethnic tensions. *See, e.g.,* Julie Schmit, *Indonesian Violence Spreads, As Does Fear,* USA Today, Jan. 20, 2000, at 8A (AR 251–52); *see also* Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, 1999 Country Reports on Human Rights Practices: Indonesia § 5 (Feb. 25, 2000)[hereinafter 1999 Indonesia Country Report] (documenting attacks on Christian churches, and explaining that while attacks on churches "clearly reflect religious tensions," other "contributing factors" include "underlying socioeconomic and political tensions between poor Muslims and relatively more affluent ethnic Chinese Christians") (AR 221).

We recognize that Indonesia's ethnic Chinese minority is often described as economically powerful, but any reasonable factfinder would be compelled to conclude, in light of the record presented to Judge Hayward and to the BIA, that the economic success of some ethnic Chinese is used as a convenient, recent justification for an anti-Chinese sentiment that has remained constant even as periods of social and political unrest have alternated with periods of relative calm. That sentiment emerges at times of social upheaval, when ethnic Chinese are often made the "scapegoats" for Indonesia's economic and political problems. Uli Schmetzer, *Fearful Ethnic Chinese Trying to Flee Indonesia,* Chi. Trib., May 17, 1998, at 4("For generations, [ethnic Chinese Indonesians] were killed each time governments or colonial powers needed a scapegoat for their failures. From birth, the fear of anti-Chinese pogroms haunts them.") (AR 575); *Chinese Flee Jakarta,* BBC News, May 15, 1998, *at* http:// news.bbc.co.uk/1/hi/events/indonesia/latest—news/94294.stm (describing ethnic Chinese Indonesians as "frequent scapegoats in tough times") (AR 565); *see also* Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, Country Reports on Human Rights Practices for 1997: Indonesia § 5 (Jan. 30, 1998) ("Anti–Chinese sentiment has led to attacks on Chinese-owned businesses during periods of social unrest. . . .") (AR 522); Cindy Shiner, *For Indonesia's Ethnic Chinese, A New Era Revives Old Hatreds,* Wash. Post, June 16, 1998, at A23 (describing the ethnic Chinese minority as "widely resented" for its wealth, business acumen and religion) (AR 611). Government efforts to stop this cycle of scapegoating and violence have thus far been ineffective, perhaps because ethnic Chinese are still targets of official discrimination. *See* 1999 Indonesia Country

**6.** According to Human Rights Watch, Chinese shops and homes were the intended targets of this violence, although non-Chinese shoppers and would-be looters became victims when they were trapped inside burning businesses.

Report § 1.c (stating that the Indonesian government "failed to follow up on the recommendations of the [government-commissioned] fact-finding team" that "found evidence that some elements of the military may have been involved in provoking the violence, which included attacks against Sino–Indonesian women" during the 1998 riots); *id.* § 5 (stating that government regulations prohibit Chinese schools, cultural groups and trade associations).

Given Indonesia's history of anti-Chinese violence and official discrimination, we hold that Sael's evidence compels the conclusion that Indonesia's ethnic Chinese minority is at least a "disfavored group." As the government conceded in a brief it submitted to the IJ, "certain individuals with [Sael's] characteristics—Christian of Chinese ethnicity—could have a well-founded fear of persecution in Indonesia." [7] AR 1033. Accordingly, we turn, as the government advocated in its brief, to a case-specific examination of Sael's evidence of "individualized risk." *Hoxha,* 319 F.3d at 1184.

### B.

Because the record establishes that ethnic Chinese are significantly disfavored in Indonesia, Sael must demonstrate a "comparatively low" level of individualized risk in order to prove that she has a well-founded fear of future persecution. *Id.* at 1183. She meets this burden with evidence of past threats and violence. *See Avetova–Elisseva v. INS,* 213 F.3d 1192, 1201–02 (9th Cir.2000) (recognizing that past threats and violence may establish a

sufficient individualized risk, even if they did not rise to the level of persecution); *Hoxha,* 319 F.3d at 1184 (same).

Sael testified credibly at her asylum hearing about various incidents of discrimination, harassment and threats to her safety. In November 1995, Sael lived in Jakarta in a boarding house with many other residents but only one other Chinese woman, Mimin.[8] AR 125. The two women received threats from native Indonesians; their car was often vandalized, scrawled with sexist and racist remarks, and the tires slashed. AR 126. One night, a group stoned the boarding house, shouting Sael's and Mimin's names, saying "the neighborhood is not for the Chinese." AR 127. The group tried to break through the boarding house gate but were unable to do so. *Id.* Instead, they broke into Sael's and Mimin's car, destroying it and again scribbling racist and sexist remarks. AR 128. Sael and Mimin reported the incident to the police the next morning, but the police advised them not to file a report because an investigation would anger the perpetrators and put Sael and Mimin in more danger. *Id.* Sael moved out of the boarding house that day. AR 129.

Fleeing discrimination and harassment was not new to Sael. Even as a young child, she was discriminated against by her peers, who told her that she did not belong in their public school because she had small eyes. AR 114. These were not just spats in the sandbox. Sael's teachers treated her differently from native Indonesian children. *Id.* As a result, her parents transferred her to a Catholic school with ethnic Chinese and Christian students.

---

7. Sael testified that she is Christian. AR 111.

8. Sael explained that she chose to live in a predominantly non-Chinese boarding house for two reasons. First, Sael tried all her life "to be identified as a native," so she "tried to stay [where] mostly native people live" because she "want[ed] to be friends with them." AR 141. Second, Sael explained that "when the riot comes, it's usually where the Chinese people are," so Sael chose not to live in a Chinese neighborhood. AR 141.

AR 113–14. Sael was forced to flee after an encounter with angry mobs in May 1998. She and Manariangkuba were in a taxi when they passed a crowd of demonstrators who were jumping and shouting, burning buildings and cars. Manariangkuba saw the mob carrying two Chinese women from their homes and told Sael to duck down in the back seat. When they entered the crowd, Manariangkuba shouted, "we are native, we are Muslim." AR 117–18. With those words, the rioters eased off and even pointed out how to get around the crowd. AR 118.

After evading one crowd, Sael and Manariangkuba came upon another. This time one of the rioters spotted Sael in the back seat and said: "[H]ey, there is one Chinese woman over here." AR 119. The crowd rushed towards the car. Manariangkuba told the taxi driver to get away from the mob. AR 119. The rioters tried to open the door and banged on the windows while Sael's husband kept yelling, "she's my wife, we're native, we're native." The rioters did not relent, but the taxi was able to pull away from the mob, which began throwing rocks at it. AR 120. After that close encounter, Sael resigned from her job in Jakarta and did not leave her house in Bandung for three weeks, not even to buy groceries. AR 121.

Sael could not escape harassment and threats even in her own neighborhood. After three weeks of confinement at home, she had to take her infant son to get immunized at the hospital. AR 122. On the way to the hospital, she saw two men whom she recognized from the neighborhood and stopped to see if they needed a ride into town. *Id.* Instead, they broke off her windshield wiper and one of her rearview mirrors, telling Seal that she had "better be careful" because she was "the only one over here." AR 124. Sael testified that the men meant to refer to her

ethnicity, because she was the only Chinese person in the neighborhood. AR 143, 149.

These past experiences with anti-Chinese threats and violence support a "specific inference of personal danger." *Hartooni v. INS*, 21 F.3d 336, 341 (9th Cir. 1994) (internal quotation marks omitted); *see also Hoxha*, 319 F.3d at 1184 ("[T]he threats and violence Hoxha experienced, although not sufficient to compel a finding of past persecution that would create a presumption in his favor, are indicative of his individualized risk of experiencing similar mistreatment if he returns to Kosovo."). In *Hartooni*, the asylum applicant was a Christian Armenian from Iran. The Iranian government had closed the applicant's Armenian Christian school and forbidden the celebration of Christmas. 21 F.3d at 341. One time, soldiers stoned Hartooni's church while she was inside. *Id.* Another time, they approached Hartooni and a group of girls, who did not have their hair properly bound, and took some of the girls away, although Hartooni managed to escape. *Id.* Soldiers also visited Hartooni's family's home to ask about relatives who had fled to the United States, including Hartooni. *Id.* Although Hartooni was never personally harmed, we held that these incidents, if believed, would be "enough to satisfy the requirement of a personal connection to the general persecution suffered by Christian Armenians in Iran." *Id.* at 342; *see also Hoxha*, 319 F.3d at 1181, 1184 (holding that the petitioner demonstrated a "particularized risk" of persecution on account of his Albanian ethnicity with evidence that he was harassed and threatened, attacked on one occasion by a group of anti-Albanian Serbs, and ordered to appear for an "informative conversation" with authorities); *Avetova–Elisseva*, 213 F.3d at 1197, 1201–02 (holding that the petitioner established a "personalized threat" of future persecution on ac-

count of her Armenian ethnicity with evidence that she was "harassed and pushed by Russian officers" and could not get a job because of her ethnicity, and with evidence that an Armenian friend's daughter was raped and beaten).

As in *Hartooni, Hoxha,* and *Avetova–Elisseva,* Sael's past experiences establish a sufficient personal connection to the general persecution directed against ethnic Chinese in Indonesia. Accordingly, we hold that Sael's credible testimony compels the conclusion that she has a well-founded fear of future persecution.

### C.

In rejecting Sael's claim of a well-founded fear based on a "pattern or practice" of persecution, the BIA relied on two statements in the State Department's 1999 Indonesia Country Report—one that the Indonesian government "officially promotes" ethnic tolerance and a second that "[r]acially motivated attacks against ethnic Chinese dropped sharply" in 1999. 1999 Indonesia Country Report § 5 (AR 223). Although we agree with the BIA that these statements could undermine an asylum applicant's claim that there is a "pattern or practice" of persecution, *Kotasz,* 31 F.3d at 852, the statements do not diminish Sael's claim of the general persecution of ethnic Chinese, sufficient to characterize their status as "disfavored" in Indonesia. The 1999 Indonesia Country Report confirms that ethnic Chinese are at least a "disfavored" minority group. It documents continued resentment, discrimina-

tion and ethnic violence; official prohibitions on Chinese schools and associations; and a failure to follow up on recommendations for improvement after the 1998 riots. 1999 Indonesia Country Report §§ 1.c, 5 (AR 178, 189–90, 218, 223). It also documents an inadequate government response to inter-religious violence that is often directed against Chinese Christians. *Id.* § 5 (AR 178, 221).

Compared with this evidence, the statements relied on by the BIA have little relevance to Sael's claim. Official discrimination continues, and hundreds of pages of news articles and human rights reports document a centuries-old anti-Chinese sentiment that continues to erupt in violence during periods of social, political or economic difficulty. *See, e.g., Indonesia Alert* (referring to "spasms" of anti-Chinese violence). By relying on a one-year decline that is actually *consistent* with this cycle of waxing and waning violence, the BIA ignored the central issue raised by Sael's past experiences and by the compelling historical record.[9] When a minority group's "disfavored" status is rooted in centuries of persecution, year-to-year fluctuations cannot reasonably be viewed as disposing of an applicant's claim.

Simply put, the two statements emphasized by the BIA are not "substantial evidence" for the denial of asylum in Sael's case. *Khup v. Ashcroft,* 376 F.3d 898, 905(9th Cir.2004). There is nothing in the record to indicate either that the historical treatment of ethnic Chinese as a "disfavored group" or that Sael's fear of perse-

---

9. We note that Judge Hayward addressed the issue head-on. Although she found a "considerable basis" for optimism, she also found inadequate current evidence "that the Indonesian government, both in the short term and into the foreseeable future, will[,] in fact, be able to protect the ethnic Chinese." Judge Hayward understood that Sael might be able to live safely in Indonesia "during periods of

relative calm" but also understood that Sael "need not establish a well-founded fear of persecution immediately upon return to Indonesia." Having carefully reviewed the evidence, Judge Hayward concluded, as we do, that the cyclic nature of anti-Chinese violence in Indonesia does not "negate[ ] the reasonableness of [Sael's] fear . . . ."

cution based on past acts of harassment have diminished.

## III.

For the foregoing reasons, we grant the petition for review and hold that Sael's compelling evidence establishes her eligibility for asylum. We remand so that the Attorney General may exercise his discretion as to whether to grant relief.[10]

**PETITION GRANTED; REMANDED.**

---

10. We do not address withholding of removal or relief under the Convention Against Torture because Sael has not pursued those claims on appeal.