# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-3111 & 03-3965

YULIA FIRMANSJAH,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,[1]

*Respondent.*

On Petitions for Review of Orders
of the Board of Immigration Appeals.
No. A75 979 022

ARGUED JUNE 17, 2004—DECIDED SEPTEMBER 16, 2005

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Yulia Firmansjah, a citizen of Indonesia, entered the United States as a student and overstayed her visa. She subsequently filed an application for asylum and withholding of removal. After a hearing, the immigration judge denied Firmansjah's asylum request on the ground that Firmansjah was firmly resettled in Singapore prior to her arrival in the United States. The immigra-

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted the current Attorney General of the United States, Alberto R. Gonzales, as the named respondent.

tion judge also denied her request for withholding of removal, reasoning that she had not shown a clear probability that she would be persecuted if removed to Indonesia. The Bureau of Immigration Affairs affirmed without discussion, and Firmansjah appeals. For the reasons that follow, we find that substantial evidence supports the immigration judge's determinations and deny the petitions for review.

## I. BACKGROUND

Yulia Firmansjah was born in Indonesia and is an Indonesian citizen. She is ethnically Chinese. At her asylum hearing, she recounted that in 1986, when she was twelve years old, she and her family moved from their home in Jakarta, Indonesia to the western outskirts of Jakarta in an effort to avoid anti-Chinese violence in the city. In 1988, at the age of sixteen, she moved with her family to Singapore, where she attended high school for four years. She lived with her family in Singapore from 1988 to 1992 when, at the age of nineteen, she entered the United States on a student visa. She studied at the University of Dayton, where she received a bachelor's degree in environmental engineering technology and a master's degree in business administration.

Firmansjah testified that in approximately 1990, her father removed all his money from Singapore and re-invested it in business in Indonesia. In 1995 or 1996, after her siblings finished high school and she was already living in the United States, her parents moved back to Indonesia. In 1998, as a result of anti-Chinese violence in Indonesia, her parents twice left Indonesia and headed to Singapore. She testified that as of December 2000, her parents lived in Indonesia but retained their residency in Singapore.

Firmansjah's most recent visa expired on December 26, 1997, and she acknowledged that she stayed in the United

States beyond her visa's expiration. She stated that at the time of her graduation from college, she had planned to return to Indonesia. However, after riots in Indonesia in May 1998 during which ethnic Chinese persons were harmed, her parents advised her not to do so. Instead, she completed an application for asylum. On her application for asylum dated September 16, 1998, she stated that she had a "Singapore residence permit" and was "entitled to return to Singapore for residence reasons." At her hearing, she testified that although her parents were still Singapore residents, she no longer had "residency" in Singapore because it had expired in March of 2000.

Firmansjah asserted that if returned to Indonesia, she feared persecution based on her ethnicity (Chinese), religion (Catholic), and status as a young westernized Chinese woman. She expressed fear that the government was unable to control violence towards Christians or Chinese in Indonesia. She also testified that she did not know anyone personally who had been the victim of anti-Chinese violence in Indonesia.

The immigration judge denied Firmansjah's request for asylum on the ground that she had firmly resettled in Singapore prior to entering the United States. The immigration judge also denied her request for withholding of removal, reasoning that she had not established a clear probability that she would face persecution if returned to Indonesia. Her request for voluntary departure was granted, with an alternative order of removal to Indonesia. Firmansjah appealed the immigration judge's decision to the Board of Immigration Appeals, which summarily affirmed the immigration judge's decision without opinion.

## II. ANALYSIS

Firmansjah raises two issues in her petition for review. First, she contends that the immigration judge erred

when he determined that she had firmly resettled in Singapore prior to her arrival in the United States. In addition, she maintains that the immigration judge's finding that she was not entitled to withholding of removal was not supported by substantial evidence. Where, as here, the Board of Immigration Appeals affirms the immigration judge's decision without opinion, we review the decision of the immigration judge as the "final agency determination." *Rashiah v. Ashcroft*, 388 F.3d 1126, 1131 (7th Cir. 2004).

A.  Asylum

To be eligible for a discretionary grant of asylum, an applicant must establish that she is a "refugee" within the meaning of the Immigration and Nationality Act. 8 U.S.C. § 1158(b)(1); *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005). The Act defines a "refugee" as one who is unable or unwilling to return to her native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The petitioner carries the burden of establishing eligibility for asylum. *Jamal-Daoud*, 403 F.3d at 922; 8 C.F.R. § 208.13(a).

Although it has not always been the case, under the current statute, an alien is not eligible for asylum if she was "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi);[2] *see Abdille*

---

[2] This provision applies to aliens who, like Firmansjah, file asylum applications on or after April 1, 1997. *See* Pub. Law No. 104-208, 110 Stat. 3009 (1996). Effective October 1, 1990, the Immigration and Naturalization Service amended its regulations to provide that a finding of firm resettlement mandated the denial

(continued...)

*v. Ashcroft*, 242 F.3d 477, 483 n.4 (3d Cir. 2001) (discussing history of firm resettlement and noting that prior to 1990, firm resettlement was only one factor for immigration judge to consider in deciding whether to grant asylum); *see also Diallo v. Ashcroft*, 381 F.3d 687, 692 n.4, 693 (7th Cir. 2004). Here, the immigration judge found that Firmansjah had firmly resettled in Singapore prior to entering the United States and denied her asylum request on that basis. Firmansjah maintains that this finding was erroneous.

"A finding of firm resettlement is a factual determination." *Diallo*, 381 F.3d at 695. Therefore, we will review the immigration judge's decision only to determine whether substantial evidence supports it. *Id.* The finding that Firmansjah was firmly resettled "must be upheld if it is supported 'by reasonable, substantial, and probative evidence on the record considered as a whole,'" and we will reverse only if a reasonable fact-finder would be compelled to reach a different conclusion. *Id.* (citations omitted).

We considered the firm resettlement provision in the current statute for the first time in *Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004). There, we observed that the statute does not define the term "firm resettlement" or provide guidance for how to determine whether a refugee was firmly resettled. 381 F.3d at 692. The regulations, however, provide that:

> [a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she

---

[2] (...continued)
of asylum. *See* 8 C.F.R. § 208.14(c)(2) (1991); *see also* 8 C.F.R. § 202.13(c)(2)(i)(B) (2000) (stating that for asylum applications filed before April 1, 1997, an immigration or asylum officer shall not grant asylum to any alien who "[h]as been firmly resettled."). In 1996, Congress codified this mandatory bar at 8 U.S.C. § 1158(b)(2)(A)(vi).

entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement . . . .

8 C.F.R. § 208.15.[3]

We decided in *Diallo,* after examining the text of the statute, that "the primary and most important inquiry in any analysis of firm resettlement is whether or not the stopover country has made some type of offer of permanent resettlement." *Id.* at 693-94. Not all circuits take this approach, as some employ a "totality of the circumstances" test that also examines non-offer based elements such as an applicant's length of stay and social and economic ties in the third country. *See*, *e.g.*, *Mussie v. U.S. I.N.S.*, 172 F.3d 329, 332 (4th Cir. 1999); *Cheo v. I.N.S.*, 162 F.3d 1227, 1229 (9th Cir. 1998). Although we recognized in *Diallo* that "'circumstances may arise in which the INS may not be able to secure direct evidence of a formal government offer of some type of permanent resettlement,'" we made clear that our initial inquiry asks whether the third country extended an offer of permanent resettlement. 381 F.3d at 694 (citing *Abdille*, 242 F.3d at 486-87).

---

[3] The regulation further provides that an applicant will not be considered firmly resettled if he or she establishes:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that nation only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b) That the conditions of his or her residence were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled.

8 C.F.R. § 208.15. Firmansjah does not contend that either exception applies.

The government has the initial burden of demonstrating that an applicant was firmly resettled in a third country prior to entering the United States. *Diallo*, 381 F.3d at 693. If the government satisfies its burden, the applicant may rebut the presumption by presenting evidence to the contrary. *Id.*

Firmansjah argues that the only evidence the government produced in its attempt to demonstrate her permanent residence in Singapore was a stamp on her Indonesian passport. The stamp, dated March 14, 1995, states it is a "multiple-journey visa for Singapore" valid until March 14, 2000. Firmansjah contends that there is no evidence that this time-limited stamp granted her "permanent" residency in Singapore.

Firmansjah's focus on the five-year nature of her visa stamp ignores significant other evidence in the record. In support of its position that it met its initial burden of demonstrating that Firmansjah was firmly resettled prior to entering the United States, the government points to Firmansjah's statements on her asylum application and her testimony at the hearing. First, in answer to a question on the asylum application that asked, "Do you . . . now hold, or have you ever held, permanent residence, other permanent status, or citizenship, in any country other than the one from which you are now claiming asylum?", Firmansjah checked "Yes" and typed, "I do have a Singapore permanent resident permit." In addition, she stated elsewhere on her application that she was "entitled to return to Singapore for residence purposes." At the hearing, she confirmed the answers she had provided on her asylum application. She testified that she received a Singapore permanent resident card in 1988.[4] In addition, she testified that at the time of

---

[4] The transcript states:

(continued...)

her application in 1998, she still maintained her residency in Singapore.

We agree with the government that Firmansjah's admission in both her written application and oral testimony that she had received permanent resident status in Singapore satisfied the government's initial burden of producing evidence indicating that Firmansjah had resettled in a third country. The burden then shifted to Firmansjah to show that she was not firmly resettled.

Firmansjah points to the five year entry stamp on her passport that expired in March 2000, contending that its limited nature demonstrates it did not confer "permanent" status on her. In addition, she contends, the expiration date of her visa coincides with the time that she testified her permanent residency expired. It is possible that Firmansjah was mistaken as to her real status in Singapore, and it would have helped us if the government had introduced evidence of what "permanent resident" status or its equivalent entails under Singapore law. *Cf. Abdille*, 242 F.3d at 490-92 (concluding that party seeking to rely on foreign law bears burden of establishing its content). However, although represented by counsel at her hearing, she introduced no evidence and offered no explanation of why she

---

[4] (...continued)

Q.  What type of status was your family given in Singapore? Permanent resident statue [sic], or?

A.  Because we, we, we do, we have an investment, yeah, they did give us (indiscernible).

Q.  So, did you get permanent resident cards?

A.  Uh-huh.

Q.  And that was in 1988?

A.  Yes.

(A.R. 135.)

consistently maintained on both her asylum application and in her testimony that she had permanent resident status in Singapore at the time of her application and had obtained that status in 1988, if she did not in fact have this status.

Firmansjah also contends that her Singapore residency should be disregarded because her parents may have fraudulently obtained their permanent resident status, thus rendering their status "null and void." She admitted, however, that her parents still maintain their residency in Singapore, and she did not indicate that Singapore officials had ever attempted to revoke their status. Firmansjah offered no evidence other than her own speculation to support her assertion that her parents may have obtained their status illegally. The bottom line is that according to her own testimony, Singapore still considers her parents permanent residents. Therefore, Firmansjah's conjecture that her family may have obtained their permanent residency status improperly does not help her. *See Rife v. Ashcroft*, 374 F.3d 606, 611 (8th Cir. 2004) (rejecting argument that Israeli citizenship invalid because applicants were practicing Christians, where Israel had offered applicants permanent resettlement under its Law of Return and issued certificates evidencing citizenship, and there was no evidence that Israel had ever revoked such a citizenship offer upon learning of conversion to Christianity); *Salazar v. Ashcroft*, 359 F.3d 45, 51 (1st Cir. 2004) (holding that alien's testimony that he paid another person to obtain residence stamp did not require immigration judge to discount its facial validity).

In addition, the expiration of her permanent residency status prior to the hearing in this case does not preclude a finding that Firmansjah had firmly resettled in Singapore. Firmansjah testified that by the time of the December 2000 hearing, she no longer had her residency in Singapore and believed it had expired in March of that year. She testified that at the time she filed for asylum, however, she still

maintained permanent residency status in Singapore. She explained that maintaining her residency status in Singapore required her to return to Singapore to obtain an extension. However, she had not done so.

The text of the statute provides that firm resettlement is determined by asking whether the applicant was firmly resettled "prior to" arrival in the United States. 8 U.S.C. § 1158(b)(2). In *Abdalla v. I.N.S.,* 43 F.3d 1397 (10th Cir. 1994), the Tenth Circuit held that a firm resettlement finding is not "affected by the possibility that by terminating his [third country] residence permit . . . petitioner may have jeopardized his entitlement to resume residence in that country through his extended (and illegal) stay in the United States." 43 F.3d at 1400. This rule prohibits an alien from "bootstrapping an asylum claim simply by unilaterally severing his existing ties to a third country*." Id.*; *see also Elzour v. Ashcroft*, 378 F.3d 1143, 1152 (10th Cir. 2004); *Ali v. Reno*, 237 F.3d 591, 595-96 (6th Cir. 2001); *Vang v. I.N.S.*, 146 F.3d 1114, 1117 (9th Cir. 1998). Here, there is ample evidence that Firmansjah had permanent resident status in Singapore prior to her arrival in the United States, but apparently she let that status expire. Moreover, Firmansjah testified that at the time she filed her asylum application, she still retained her residency status in Singapore.[5] Keeping in mind our deferential standard of review, we cannot say that the immigration judge's finding was unsupported by substantial evidence.

Firmansjah also argues, without case citation, that her due process rights were violated because the immigra-

---

[5] We note that a finding that an applicant firmly resettled in a third country does not preclude the applicant from establishing that events after resettlement constitute past persecution or create a well-founded fear of future persecution, thereby entitling the applicant to asylum from the country of resettlement. *See Rife v. Ashcroft*, 374 F.3d 606, 612 (8th Cir. 2004).

tion judge did not make clear that he would "base the thrust of his decision" on a firm resettlement finding. We disagree. Firmansjah's counsel addressed the firm resettlement issue in her closing argument, and the parties had a colloquy with the court following the arguments on this issue. Moreover, in order to prevail on a due process claim, an applicant must show prejudice. *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004). Firmansjah has not demonstrated prejudice, as she has not suggested what evidence she would have produced had she received more notice that firm resettlement, an explicit statutory bar to asylum, would be an issue.

B. Withholding of removal

Although a finding of firm resettlement is, by statute, a bar to eligibility for asylum, no statute or regulation bars the grant of withholding of removal upon a finding that an applicant firmly resettled in a third country prior to entering the United States. We will therefore consider the withholding of removal claim separately from the barred asylum claim, as have other circuits. *Madjakpor v. Gonzales*, 406 F.3d 1040, 1046 (8th Cir. 2005); *Rife*, 374 F.3d at 613; *Salazar*, 359 F.3d at 52; *Vang*, 146 F.3d at 1116-17; *Abdalla*, 43 F.3d at 1399. When we review the denial of an application for withholding of removal, we will uphold the decision if it is supported by substantial evidence. *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005).

Unlike the decision to grant asylum, which is discretionary even if the criteria for asylum are met, the Attorney General *must* withhold deportation if he determines "that the alien's life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant bears the burden of establish-

ing entitlement to withholding of removal. *Zheng*, 409 F.3d at 809. To meet this burden, the applicant must demonstrate a "clear probability" that he or she will face persecution in the country to which he or she will be removed. *Id.* The "clear probability" standard requires an applicant to show that it is "more likely than not" that she will be subject to persecution if returned to her native country, a more stringent test than the standard for establishing eligibility for asylum. *Id.*

Although withholding of removal is based on the likelihood of future persecution, if an applicant demonstrates that she suffered past persecution in the proposed country of removal, "it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1); *see also Zaidi v. Ashcroft*, 377 F.3d 678, 681 (7th Cir. 2004). The government can rebut this presumption by demonstrating either a fundamental change in circumstances or that the applicant could avoid persecution by relocating to another part of the proposed country of removal. 8 C.F.R. § 1208.16(b)(1)(i).

We first address Firmansjah's contention that she established past persecution, which, if true, would entitle her to a presumption of future persecution. Although she testified that neither she nor any member of her family was ever threatened or harmed in Indonesia, Firmansjah contends her testimony that her parents changed their Chinese names to other names pursuant to Indonesian law establishes that she was persecuted. She maintains that the United States would not consider the requirement to change one's name on account of ethnicity legitimate, and, therefore, she has demonstrated her past persecution in Indonesia.

Although requiring a name change solely based on one's ethnicity is reprehensible, we do not agree that her parents'

name change establishes that Firmansjah was persecuted. First, as the government points out, Firmansjah was not required to change her name, and we have rejected claims of "derivative persecution." *See, e.g.*, *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003); *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000). We do recognize, however, that Firmansjah testified that while in Indonesia, she cannot use the Chinese name her family also gave her. In any event, the name change does not rise to the level of persecution. "'[P]ersecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.'" *Sharif v. I.N.S.*, 87 F.3d 932, 935 (7th Cir. 1996) (citation omitted). Instead, we have stated that persecution means "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Bace v. Ashcroft*, 352 F.3d 1133, 1137-38 (7th Cir. 2003). We have emphasized that "persecution" means "more than harassment" and have held it to include such actions as "'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Toptchev v. I.N.S.*, 295 F.3d 714, 720 (7th Cir. 2002) (citations omitted). Although actions need not be life-threatening to constitute "persecution," we have stated the term could include such non-life-threatening actions as economic deprivation only "if the resulting conditions are sufficiently severe." *Capric*, 355 F.3d at 1084.

A requirement to change one's name, without more, does not rise to the level of punishment or harm necessary to constitute persecution under the Immigration and Nationality Act. Firmansjah did not testify that she or her parents were ever threatened with any consequence had they not changed their names. *Cf. Popova v. I.N.S.*, 273 F.3d 1251, 1258 (9th Cir. 2001) (noting evidence that petitioner was fired when she refused to change her last name supported a finding of past persecution). Instead, a law requiring a

name change based on one's ethnicity more closely resembles circumstances that we have recognized our society would regard as unfair or unjust, but that does not constitute "persecution" allowing the applicant to asylum or withholding of removal relief. *See, e.g.*, *Yadegar-Sargis v. I.N.S.*, 297 F.3d 596 (7th Cir. 2002) (finding no persecution where woman in Iran was "confronted by police because her dress did not conform to the requirements imposed by the dominant religion, interrogated concerning her son and forced to the end of rationing lines. However, [the applicant] never was detained; she was not physically assaulted; she did not suffer extreme economic deprivation; nor was she the direct subject of a physical threat."). Firmansjah did not establish that she suffered from past persecution in Indonesia.

Although she was unable to demonstrate past persecution in Indonesia, Firmansjah is entitled to withholding of removal if she can establish a clear probability of future persecution if returned to Indonesia on account of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Firmansjah contends that she demonstrated a clear probability of future prosecution on account of her status as a Catholic, ethnic Chinese woman who has been westernized. Although we are not unsympathetic to the applicant, we cannot say the immigration judge's finding—that Firmansjah did not demonstrate it was "more likely than not" that she would be persecuted upon a return to Indonesia—was unsupported by substantial evidence.

Firmansjah first argues that the immigration judge improperly rejected her claim that she was a member of a discrete and cognizable group of Roman Catholic women of Chinese ethnicity who have been westernized. The immigration judge did not base his decision on whether she was a member of a "social group," however. Rather, the immigration judge stated that while he did not believe that

Christian ethnic Chinese women who had studied in the United States constituted a cognizable "particular social group," Firmansjah failed to show this group had been targeted by the government or by groups the government is unable or unwilling to control.

Next, Firmansjah challenges the finding that she did not establish it was "more likely than not" that she would be persecuted if returned to Indonesia. The record contains numerous documents concerning conditions in Indonesia, including newspaper articles, reports by human rights organizations, and State Department reports. This documentary evidence corroborates Firmansjah's testimony of a history of anti-Chinese sentiment in Indonesia, as well as civil unrest and anti-Chinese violence in Indonesia in 1998. In May 1998, rioting broke out in Indonesia following the shooting of students by police snipers, and anti-Chinese sentiment led to widespread attacks on Chinese-owned businesses. According to the 1999 State Department report, at least 85 instances of violence against ethnic Chinese women, including 66 rapes, were verified during the 1998 riots. In addition, Firmansjah testified that although she was then residing in the United States, her parents twice left Indonesia in 1998 to escape rioting.

The immigration judge properly recognized the "religious and ethnic strife" that continued to exist in Indonesia at the time of his decision. As the immigration judge observed, however, the 1998 riots resulted in the overthrow of the existing government. The next year, a democratically elected parliament elected a new president. The 1999 State Department Report found that "Racially motivated attacks against ethnic Chinese citizens dropped sharply during [1999]," and newspaper articles in the record discussed steps taken by the government to attempt to control the ethnic and religious tension. *E.g.*, A.R. 610. In reaching his conclusion, the immigration judge also pointed to

Firmansjah's testimony that her family continued to reside in Indonesia and has never been harmed there. We have recognized before that the absence of any evidence of harm to family members undermines an applicant's claim of a fear of future persecution. *See Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999). Firmansjah also admitted that she did not personally know anyone who had been the victim of anti-Chinese violence in Indonesia, and she testified that neither she nor anyone she knew had ever been threatened by the Indonesian government.

Unlike her family members, however, Firmansjah studied in the United States, a factor she contends contributes to the likelihood of her persecution. The immigration judge recognized that bomb threats and demonstrations had forced the United States Embassy in Jakarta to close down. However, the judge noted, these threats were actions directed against the United States government. Firmansjah does not direct us to any evidence of the mistreatment of Indonesians who had studied or lived in western countries by other Indonesians. Keeping in mind our deferential standard of review, we find that substantial evidence supports the immigration judge's determination that Firmansjah failed to carry her burden of demonstrating it would be "more likely than not" that she would be subject to persecution if returned to Indonesia, "a much more demanding burden" than necessary to establish a well-founded fear of future persecution. *Capric*, 355 F.3d at 1095.[6]

---

[6] For similar reasons, the Third Circuit held that two Indonesian citizens failed to meet even the lower threshold of a well-founded fear of future persecution in Indonesia because of their status as ethnic Chinese Christians. *Lie v. Ashcroft*, 396 F.3d 530 (3d Cir. 2005). In contrast, the Ninth Circuit in *Sael v. Ashcroft*, 386 F.3d 922 (9th Cir. 2004) ruled that an ethnically Chinese Indone-

(continued...)

### III.  CONCLUSION

For the foregoing reasons, Firmansjah's petitions for review are DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[6]  (...continued)
sian citizen had established a well-founded fear of persecution in Indonesia. The *Sael* court concluded that "ethnic Chinese [were] significantly disfavored in Indonesia," and then required the applicant to demonstrate a "'comparatively low' level" of risk in order to establish a well-founded fear of future persecution. 386 F.3d at 927.

*Sael* does not aid Firmansjah. First, unlike the withholding of removal claim at issue before us, *Sael* considered whether an applicant met the less stringent standard of a well-founded fear of persecution. Not only was *Sael* considering a standard that was less stringent on its face, but *Sael* required an even lower level of individualized risk after finding that the applicants were members of a "disfavored group." This circuit has not recognized a lower threshold of proof based on membership in a "disfavored group." *Cf. Lie*, 396 F.3d at 538 n.4 (rejecting establishment of a "disfavored group" category and disagreeing with *Sael*'s use of a lower standard). In addition, the Ninth Circuit found that the applicant in *Sael* established a well-founded fear of persecution based on past threats and violence directed towards her. *Sael*, 386 F.3d at 927. Firmansjah, however, testified that no threats were ever directed towards her or her family.

---