UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 9, 2006
Decided December 4, 2006

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 06-1339

| | |
|---|---|
| YVONNE PUPELLA, et al. | Petition for Review of an Order of the |
| *Petitioners*, | Board of Immigration Appeals |
| | |
| *v.* | Nos. A96-496-957 |
| | A96-496-958 |
| ALBERTO GONZALES, | A96-496-959 |
| *Respondent*. | |

**O R D E R**

Yvonne Pupella, an Indonesian national who is Christian and ethnically Chinese, suffered a run-in with an anti-Chinese mob during a massive riot in 1998. She was accosted in her taxi, slurred, and slashed with a knife. Her husband William (who, along with the Pupellas' child, joins Yvonne's petition), had a similar experience. They moved to the United States in 1999. In 2003 after her husband's labor certification expired, Pupella applied for asylum, withholding of removal, and relief under the Convention Against Torture. The Immigration Judge (IJ) denied the asylum application because it was untimely and denied other relief on the merits. The Board of Immigration Appeals (BIA) affirmed. Pupella now petitions for review of those decisions in this court, challenging the denial of her applications for asylum and withholding of removal. We are without jurisdiction to hear Pupella's asylum claim; we deny the claim for withholding of removal on its merits.

In her testimony before the IJ, Pupella described the general anti-Chinese sentiment that has pervaded Indonesia since her childhood. Her applications for relief stem largely from incidents that she and her husband experienced during and after massive riots in 1998, which included anti-Chinese pogroms and ultimately led to the downfall of President Suharto's regime. She stated in her asylum application that on May 10, 1998, as she was attempting to leave the country in the heat of the riots, her taxi to the airport "was stopped and confronted by a Muslim mob of about 5-6 people." She suspects that she was targeted because of her Chinese features. After she was ordered out of the taxi, a van of ethnic Chinese passed by and invited her in. She joined them, but on her way was slashed with a knife by one of the rioters, leaving "a permanent 3-inch scar on my left chest." In her testimony before the IJ, she characterized her wound as "some scratches." In an affidavit, she stated that her assailants slurred her by shouting the derogatory term, "Cina!" A nurse bandaged her wounds but she did not obtain further treatment because she did not want to miss her flight.

William underwent a similar ordeal. In July 1999, on his way to church in a taxi, he was stopped by "a group of Muslim youths." After seeing that he was Chinese, they told him to get out of the car and proceeded to steal his watch and wallet and to punch him in the face several times, shouting "Cina!" all the while.

The Pupellas, who have spent most of their lives in Japan, visited the United States several times and then moved here on a student visa in 1999 so William could attend graduate school at the University of Chicago. Yvonne returned to Indonesia in late 1999 and in April 2001; on the latter visit she sold three pieces of property that she owned there. In May 2001 William adjusted his status based on a work visa; he worked for KPMG, the public accounting firm. But he lost his job in April 2002 after the Enron accounting scandal. He was allowed to remain at the firm on a temporary basis until November 2002. Yvonne eventually applied for asylum in April 2003.

The IJ found that the asylum application was untimely because it was filed more than a year after the Pupellas arrived in the United States, 8 U.S.C. § 1158(a)(2)(B), and they did not demonstrate changed or extraordinary circumstances that would excuse the tardy filing five months after William fell out of status, id. § 1158(a)(2)(D). Yvonne testified that during the summer of 2002 she gave birth at an advanced age to twins who had developmental disabilities, and argued that this ordeal qualified as "extraordinary circumstances," but the IJ was unmoved. For sake of completeness, the IJ also evaluated the merits of the asylum claim and concluded that the Pupellas' encounters with anti-Chinese rioters were not serious enough to qualify as past persecution, and that their fear of returning was no more than a concern about general strife in Indonesia and was therefore not well-founded. Because they did not qualify for asylum, the IJ also denied

withholding of removal and CAT relief, which have even more stringent standards. The BIA affirmed, adopting the IJ's opinion and adding a few lines of its own.

On appeal, Pupella first challenges the IJ's denial of her application for asylum, arguing that the reasons she put forth should excuse her tardy application, and that the application should succeed on the merits. We are without jurisdiction to hear the claim. It is undisputed that the application was filed over a year after the Pupellas arrived in the United States, and the statute providing exceptions to the one-year rule provides for relief only if the applicant demonstrates changed or extraordinary circumstances "to the satisfaction of the Attorney General." 8 U.S.C. § 1158(a)(2)(D). The statute goes on to provide, "No court shall have jurisdiction to review any determination of the Attorney General" under this provision. *Id.* § 1158(a)(3). Courts, including this one, have therefore universally determined that they cannot hear challenges to an IJ's decision that an asylum application is untimely. *See Vasile v. Gonzales*, 417 F.3d 766, 768–69 (7th Cir. 2005)*; Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 154 (2d Cir. 2006); *Mehilli v. Gonzales*, 433 F.3d 86, 93 (1st Cir. 2005); *Ramadan v. Gonzales*, 427 F.3d 1218, 1221–22 (9th Cir. 2005); *Chacon-Botero v. U.S. Att'y Gen.*, 427 F.3d 954, 956–57 (11th Cir. 2005); *Castellano-Chacon v. INS*, 341 F.3d 533, 543–44 (6th Cir. 2003). The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231, 310–11, leaves the door open a crack, amending 8 U.S.C. § 1252(a)(2) to provide that no statute shall eliminate judicial review of legal or constitutional questions, but Pupella did not attempt to raise such a claim until oral argument, and then did so only perfunctorily.

Next Pupella challenges the IJ's determination that she does not qualify for withholding of removal. The standard for this relief is higher than for asylum; the applicant must show that it is more likely than not that she would be persecuted if returned home. *See* 8 C.F.R. § 208.16(b); *see also Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006). Pupella appears to concede that her encounter with rioters and William's mugging are not serious enough to rise to the level of past persecution. And she does not argue that ethnic Chinese and Christians in Indonesia suffer a "pattern or practice" of persecution. *See* 8 C.F.R. § 208.16(b)(2)(i)–(ii); *cf. Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005) (discussing pattern or practice in the context of asylum, rather than withholding of removal). Rather, she asks this court to adopt the Ninth Circuit's intermediate standard, which falls between individual persecution and membership in a group suffering a pattern or practice of persecution. The Ninth Circuit calls this "disfavored group" analysis, whereby the greater the persecution suffered by the group, the less individual persecution need be shown in order to qualify for relief. *See Sael v. Ashcroft*, 386 F.3d 922 (9th Cir. 2004) (Indonesian Christians are a disfavored group). That court developed the standard in *Kotasz v. INS*, 31 F.3d 847, 852–54 (9th Cir. 1994), as a sort of lesser alternative to the "pattern or practice" method of demonstrating persecution, noting that the pattern or practice regulation

is, "deliberately, far from comprehensive: it does not purport to cover the entire range of persecution related to group membership."

No other circuit has adopted the Ninth Circuit's "disfavored group" test. The Third Circuit explicitly rejected it in *Lie v. Ashcroft*, 396 F.3d 530, 538 n.4 (3d Cir. 2005), a case also dealing with a Chinese Christian from Indonesia. We cited *Lie* when we too declined to adopt the Ninth Circuit's approach in *Firmansjah v. Gonzales*, 424 F.3d 598, 607 n.6 (7th Cir. 2005), a case that Pupella acknowledges and contends was wrongly decided. *Firmansjah* mirrors Pupella's case: there, we affirmed the denial of withholding of removal to an Indonesian Christian and ethnic Chinese, holding that violence against them has receded significantly since the late 1990s. We see no reason to abandon *Firmansjah* or to adopt the "disfavored group" standard. It is based upon no statutory or regulatory text and seems needless in light of the "pattern or practice" regulation.

Even though Pupella does not argue that she and her husband have suffered persecution, or that ethnic Chinese or Christians face a pattern or practice of persecution in Indonesia, the caselaw is clear that these arguments would fail. William's mugging and Yvonne's attack were brief run-ins involving no serious injuries; they are better characterized as harassment than persecution. *See Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005). Significantly, they were not perpetrated or condoned by state authorities. *See Wijono v. Gonzales*, 439 F.3d 868, 874 (8th Cir. 2006); *Hor v. Gonzales*, 400 F.3d 482, 485–86 (7th Cir. 2005). The fact that Yvonne has returned to Indonesia several times since her encounter, and that both her family members and those of her husband still live there peacefully, undercuts her claim to fear returning. *See Firmansjah*, 424 F.3d at 606–07. Moreover, the Pupellas' encounters were isolated in time during an extraordinary period in Indonesia's recent history. Although materials in the record, such as State Department Country Reports and news accounts, show that 1998–1999 was indeed a terrifying time for Indonesian Christians and ethnic Chinese and that discrimination against them persists, current documents show that the government has taken action and the trouble has largely passed. The 2005 Country Report states that although scattered acts of violence against Christians continue, religiously motivated violence is receding and there is "broad societal support for security restoration and reconciliation." The report continues, "Instances of discrimination and harassment of ethnic Chinese declined compared with previous years." Courts, including this one in *Firmansjah*, have recognized this improved record. *See Wijono*, 439 F.3d at 873–74; *Susanto v. Gonzales*, 439 F.3d 57, 60–61 (1st Cir. 2006); *Tulengkey v. Gonzales*, 425 F.3d 1277, 1281–82 (10th Cir. 2005); *Lie*, 396 F.3d at 537. Indeed, only the Fifth Circuit, in *Eduard v. Ashcroft*, 379 F.3d 182, 192 (5th Cir. 2004), has ruled that ethnic Chinese *do* face a pattern or practice of persecution, and that case was based almost exclusively on materials discussing events in 1998.

Pupella's petition for review is DISMISSED insofar as it seeks review of her asylum claim; in all other respects the petition is DENIED.