[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-14131
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 16, 2009
THOMAS K. KAHN
CLERK

Agency Nos. A95-551-271,
A95-551-272

IMELDA MARIA EFIE SUHARTI,
NANA SURYADI,
NICKHOLAS LOUISE,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

No. 09-10475
Non-Argument Calendar

_____

Agency No. A095-551-271

IMELDA MARIA EFIE SUHARTI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petitions for Review of a Decision of the
Board of Immigration Appeals
_____

(October 16, 2009)

Before BIRCH, MARCUS and ANDERSON, Circuit Judges.

PER CURIAM:

Petitioners Imelda Maria Efie Suharti, her husband, Nana Suryadi, and their son, Nickholas Louise, seek review of final orders of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ") order denying asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c).[1] Because we lacked jurisdiction to issue the opinion issued in Suharti v. U.S. Att'y Gen., 185 Fed. Appx 878 (11th Cir. 2006) (per curiam) (No. 05-14131), we vacate and withdraw that opinion and the subsequent mandate. Because substantial evidence supports the BIA's finding that Suharti was not entitled to asylum or withholding of removal, the record does not compel the

---

[1] Although Suharti's arguments on appeal encompass the derivative claims of Suryadi and Louise, our review in No. 09-10475 is limited to Suharti's claims for relief because Suharti is the only named petitioner on the petition for review. See Fed. R. App. P. 15(a)(2)(A).

finding that she is entitled to asylum or withholding of removal.[2] We, therefore,

deny Suharti's petition for review.

## I. BACKGROUND

Suharti, Suryadi, and Louise are natives and citizens of Indonesia. Within

months after they arrived in the United States in 2002, Suharti filed an application

for asylum, withholding of removal, and CAT relief and requested derivative relief

on behalf of her husband and son. In her application, Suharti indicated that she had

been or would be harmed or mistreated on account of her race and religion and that

she feared being subjected to torture if she was returned to Indonesia. She

explained that she and her husband are ethnic-Chinese Christians and that, because

of her ethnicity and religion, she was sexually abused by native Indonesians while

attending school. She stated that the police requested a fee to process the report

regarding the sexual attack. She claimed that the Chinese were hated by native

Indonesians and Muslims and attacked by the Indonesians when anything negative

occurred in Indonesia, and that the government failed to control the Indonesians or

to protect the Chinese. In support of her application, she submitted various

documents and articles. Included in the documents were an affidavit that her

husband's store had been looted and burned in 1998, and the 1998 testimony by a

---

[2] Because Suharti failed to advance an argument concerning the denial of CAT relief, this claim is abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (when a party fails to offer argument on an issue, that issue is abandoned).

humanitarian organization representative to Congress that detailed acts of violence in Jakarta, including the burning of homes and businesses, riots, looting, and gang-rapes on Chinese women. Suharti maintained that the violence was attributable to politically organized gangs and rejected any suggestion that the violence was prompted by racial conflict.

In October 2002, the former Immigration and Naturalization Service ("INS")[3] served Suharti, Suryadi, and Louise with notices to appear ("NTA"), alleging that they were admitted as nonimmigrant visitors and were subject to removal, pursuant to 8 U.S.C. § 1227(a)(1)(B), for having remained in the United States longer than permitted.

At an asylum hearing in 2003, Suharti and Suryadi appeared pro se, admitted to the NTA factual allegations, and testified. Suharti said that she came to the United States because she feared for her safety while living in Indonesia. She stated that, when she was 15 years of age, she was stopped while walking home from school by two native-Indonesian men, who touched her breast and burned her cheek with a cigarette. When her father reported the incident, the police required him to pay a fee not required of native-Indonesians, before they prepared a report and told him that he had to pay for protection whenever it was

_____

[3] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), 6 U.S.C. §101, et seq. The HSA created the Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to DHS. Because this case was initiated while the INS was still in existence, we refer to the agency as the INS rather than DHS.

4

needed.  Suharti believed that she was attacked because of her Chinese ethnicity. She explained that native Indonesians liked to embarrass, hurt, or even kill the Chinese, especially girls, that incidents involving Chinese girls were regular occurrences, and that her attackers had identified her as Chinese before asking her what she was doing in the area and telling her to go back to her country.  Suharti also testified that (1) in December 2001, two men robbed her mother of her necklace and purse while she was entering her home after returning from church; (2) in July 2001, while pregnant with Suharti in July 2001, she was robbed and pushed to the ground which caused her water to break; and (3) in 2003, her younger sibling was robbed a month before the hearing.  She explained that a primary incident causing her fear for returning to Indonesia was a riot between the Chinese and the native Indonesians on 15 May 1998, in which Suryadi's Jakarta store was burned and looted and Suryadi was injured when the rioters were upset by a crucifix displayed in the store.  Suharti clarified that the entire shopping complex housing Suryadi's store was burned, most of the store owners were Chinese, she was actually living in Taiwan during the 1998 riot, and Suryadi had instructed her to go there because of rumors of a planned attack in Jakarta.

Suharti testified about her marriage to Suryadi, providing specific dates and details concerning her marriage ceremony, reception, and certificate.  AR at 383-84.  She then explained that, despite her fear of persecution, she traveled between

5

Taiwan and Indonesia several times because Taiwan did not have an asylum program. Suharti also testified that the Chinese were targeted in the 1998 riots because of their economic success and the belief that their destruction would return economic prosperity to native Indonesians. She acknowledged that the government attempted to stabilize the areas where rioting had erupted, but she also asserted that neither the military nor the police provided protection and that, despite a peace agreement, the native Indonesians had bombed churches. Suryadi's testimony was not recorded or transcribed.

The IJ denied Suharti's application for asylum, withholding of removal, and CAT relief, and ordered Suharti, Suryadi, and Louise removed to Indonesia. AR at 75-86. The IJ found that Suharti and Suryadi were not credible based on inconsistencies between the testimony given by Suharti and Suryadi concerning the circumstances of their marriage ceremony, reception, and certification, and Suryadi's failure to identify a particular date. The IJ further found that, even if Suharti and Suryadi were credible, they failed to satisfy their burden of showing past persecution on account of a protected ground. The IJ reasoned that the incidents to which Suharti testified amounted to a series of "criminal acts." Id. at 83. The IJ further concluded that Suharti failed to establish a well-founded fear of future persecution because she lacked credibility and failed to meet her burden of proof. The IJ found that, because Suharti failed to meet the burden required for

asylum, she necessarily failed to meet the more stringent burden required for withholding of removal. The IJ also found that Suharti failed to satisfy the burden of proof for CAT relief.

Suharti, Suryadi, and Louise appealed to the BIA and offered an explanation for the inconsistencies in the testimony concerning the details of Suharti and Suryadi's wedding. They asserted that the racial conflict was ongoing in Indonesia and noted that (1) houses neighboring their own were burned in 2003, (2) there were "fatal explosion[s]" in many public places, and (3) ethnic Chinese and Christians were persistently victimized as a result of the "war through terror" perpetrated by ethnic-Indonesians. Id. at 306. The BIA adopted and affirmed the IJ's decision on 28 June 2005. Id. at 231.

Suharti, Suryadi, and Louise petitioned for review and argued that the BIA violated due process "by affirming the denial of asylum based on the adverse credibility finding because the administrative record" did not contain the transcript of Suryadi's testimony, which was "crucial to the IJ's adverse credibility determination." Suharti, 185 Fed. Appx. at 882. In Suharti, we concluded that we lacked jurisdiction to review the due process claim because it was not raised before the BIA, and held that the IJ's alternative finding, that Suharti failed to establish persecution on account of a statutorily protected ground, was supported by

7

substantial evidence and denied the petition on that basis. Id. at 883-84. We issued our decision on 22 June 2006.

On 6 March 2006, however, the BIA sua sponte had re-opened the case and vacated its prior decision. AR at 228. It noted that Suryadi's testimony was not included in the record, and instructed the IJ to take Suryadi's testimony and render a new decision.

On remand from the BIA, Suharti submitted the United States Department of State Country Report on Human Rights Practices in Indonesia for 2006 ("2006 Country Report"). According to the 2006 Country Report, the Indonesian constitution provided for "all persons the right to worship according to his or her own religion or belief," and the government generally respected this right. Id. at 204. Further, both Protestantism and Catholicism were officially recognized religions. Violence between Christians and Muslims was reported in some parts of the country, and ethnic Chinese experienced greater difficulty than others in obtaining documentation necessary to register marriages, births, and deaths. In 2006, "the president signed a citizenship law to end longstanding discrimination against Chinese-Indonesians and Indonesian women with foreign spouses. Among other things, the law revise[d] the definition of 'indigenous Indonesian' to include all citizens who have never assumed foreign citizenship[.]" Id. at 211. In addition, "[t]he government officially promote[d] racial and ethnic tolerance." Id. at 216.

8

While "[i]nstances of discrimination and harassment of ethnic Chinese continued to decline" and efforts had been made to increase religious and cultural freedoms, some public authorities still discriminated against ethnic Chinese in issuing marriage licenses or providing other services. Id.

During the remand hearing on 2 May 2007, Suryadi attempted to clarify various details concerning his marriage ceremonies and certification. As to incidents of persecution, he testified that, in May 1998, there was a riot and his store was burned and looted by "natives who didn't like the Chinese." Id. at 149-50. During this incident, a man pointed a knife at Suryadi's stomach and "threatened to kill [him]." Id. at 150. The man yelled, "kill all the Chinese, eliminate the Chinese," before thrusting the knife toward Suryadi and cutting Suryadi's hand. Id. Suryadi stated that his store was targeted during the riot because of his Chinese ethnicity and Christian religion. Id. at 151-52. Suryadi left his store after hearing rioters say "Chinese Christian kill them all" and it was subsequently burned and destroyed. Id. During the same time period, Suryadi's Jakarta church was burned while he was attending Sunday services; Suryadi was able to get out of the building and was not injured. His Muslim neighbors threw rocks at Suryadi's home and killed and "cut up" his dog. Id. at 154-55. He notified the police of this incident and was required to pay money before police prepared a report. Because of the trauma from these incidents, Suryadi went to

9

Taiwan where he met and subsequently married Suharti. In 2001, about two years after he arrived in Taiwan, Suryadi and Suharti returned to Indonesia to formalize their marriage. Id. at 146-48. The couple stayed in Indonesia without incident for three months before traveling to the United States but Suryadi feared that his family would be killed if they returned to Indonesia.

Suryadi confirmed that he had no relationship with Suharti when his store was burned in 1998 and that they neither knew each other or co-owned the store at that time. Id. at 157, 159-60. Suryadi explained that he owned one shop in 1998 and that, after he met Suharti, her parents helped them open a second store in Surabaya. Suryadi stated that he returned from Taiwan to Indonesia for their church wedding reception in November 2000. Id. at 166-67. About two months later, he went back to Taiwan for about one year and then returned to Taiwan in December 2001 for a few months before coming to the United States in 2002.

Suharti was then recalled to clarify some of Suryadi's statements. Suharti explained that she moved to Taiwan in 1997 to attend school and knew Suryadi through the computer but did not meet him for the first time until he arrived in Taiwan. She stated that she returned to Indonesia in March 2001 because her visa expired and remained there until she came to the United States in January 2002. She admitted that she never actually had ownership interest in her husband's business and did not actually know her husband in 1997, although she had

10

previously testified that her husband told her to go to Taiwan that year. She also testified that her ethnic-Chinese mother continues to reside in Surabaya and run Suryadi's second store.

The IJ denied Suharti's application for asylum, withholding of removal, and CAT relief and ordered Suharti, Suryadi, and Louise removed to Indonesia. Id. at 62-74. He found that Suharti and Suryadi were not credible because of discrepancies between their testimony concerning their marital status and the ownership of the store in 1998. Id. at 71. In the alternative, the IJ found that Suharti demonstrated that she was the victim of criminal activity but not persecution. Id. at 71-72. The incident which occurred when she was a teenager appeared to be a random act, and the purse snatching in 2001 appeared to be a crime of opportunity. He found that Suharti could not claim that she was a victim of past persecution as a result of the looting incident because the incident appeared to have taken place before her marriage to Suryadi.

The IJ also found that Suharti could not meet her burden of demonstrating a well-founded fear of future persecution because she could not show that her fear was objectively reasonable. In support, the IJ reasoned that (1) the Indonesian president's act of signing a citizenship law to end discrimination against ethnic Chinese demonstrated that the government was "actively working to remedy past discrimination and to improve the climate" for ethnic Chinese; (2) the Indonesian

11

constitution provided Indonesians with the right to worship according to their own beliefs, and the government generally respected this right; and (3) the government officially recognized both Protestantism and Catholicism. Id. at 72. Because Suharti could not establish eligibility for asylum, she could not show that she was entitled to withholding of removal. Finally, the IJ concluded that Suharti failed to meet her burden for CAT relief because she failed to show that she suffered torture while living in Indonesia or that she would be tortured by, or with the acquiescence of, the government upon return to Indonesia.

Suharti, Suryadi, and Louise appealed to the BIA. They argued that the IJ erred in finding that (1) Suharti and Suryadi lacked credibility, (2) their suffered harm did not amount to past persecution, and (3) they failed to show a well-founded fear of future persecution. They also maintained that the IJ's decision was unsupported by the record, and the IJ erred in denying them withholding of removal. They argued that the harm Suharti and Suryadi had suffered, which included threats, abuse, the destruction of Suryadi's store, the injury to his hand, and the death of his dog, amounted to persecution on account of their ethnicity and Christian religion. They asserted that their lives and freedom were threatened. They further argued that Suharti's credible testimony was corroborated by the country reports and the other articles submitted. They also argued that, because they showed past persecution, they were presumed to have a well-founded fear of

future persecution.  They asserted they had demonstrated that they could expect persecution by native Muslims without government intervention if they returned to Indonesia and that the severity of persecution they had endured and a likelihood of future persecution compelled a favorable exercise of discretion.

They also challenged the IJ's adverse credibility finding.  Citing Sael v. Ashcroft, 386 F.3d 922 (9th Cir. 2004), they argued that they need only show that their well-founded fear was subjectively and objectively reasonable, which they contend was shown by their suffered persecution and the existing country conditions.   They argued that the IJ erred by relying on specific portions of the country reports and excluding other portions when he determined that their fear was not objectively reasonable.  Citing Sael, they argued that the ethnic Chinese were a "significantly disfavored" group in Indonesia and that ethnic-Chinese Christians faced a particularized risk of persecution there.  Finally, they argued that the IJ erred in denying them CAT relief.

The BIA dismissed Suharti, Suryadi, and Louise's appeal.  Although it concluded that the IJ's adverse credibility finding was "clearly erroneous," it agreed with the IJ's determination that they failed to provide corroboration sufficient to meet their burden of proving past persecution or a well-founded fear of future persecution on account of a protected ground.  AR at 2-3.  Specifically, the BIA concluded that they failed to establish (1) past persecution because the

13

incidents to which they testified did not amount to persecution; (2) the "requisite statutory nexus" because there was no showing that the 1998 attack on Suryadi's store or the other incidents, besides that which occurred when Suharti was a teen, were more than criminal activity or on account of a protected ground; and (3) that, more likely than not, they would face persecution upon return to Indonesia. Id. at 3. Because they failed to demonstrate eligibility for asylum, the BIA concluded, they failed to satisfy their burden for withholding of removal. Finally, the BIA concluded that they failed to satisfy the requirements for CAT relief.

## II. DISCUSSION

A. Jurisdiction in No. 05-14131

The government suggests that we vacate and withdraw our opinion in Suharti because the BIA's 6 March 2006 sua sponte reopening of the case removed the finality of its 28 June 2005 affirmance and thus stripped us of jurisdiction. It explains that, because the BIA reopened the proceedings sua sponte and not on motion from either party, the government was unaware of the BIA's March 2006 decision before the issuance of our 22 June 2006 opinion.

We must examine our jurisdiction to review orders on appeal, and do so de novo. See Jaggernauth v. U.S. Att'y Gen., 432 F.3d 1346, 1350 (11th Cir. 2005) (per curiam) (before reaching the merits of a claim, we must first address our

14

jurisdiction over the order on review).  Pursuant to 8 U.S.C. § 1252(a)(1), our jurisdiction is limited to review of final orders of removal.

Absent language explicitly upholding a final order of removal, the BIA's sua sponte reopening of proceedings removes the finality of the removal order and our jurisdiction to review it.  See Jaggernauth, 432 F.3d at 1351-52 (finding jurisdiction after the BIA granted reconsideration but explicitly upheld the earlier removal order); Gao v. Gonzales, 464 F.3d 728, 730 (7th Cir. 2006) (once the BIA has reopened proceedings, any judicial decision would be advisory); Lopez-Ruiz v. Ascroft, 298 F.3d 886, 887 (9th Cir. 2002) (per curiam) (once the BIA has granted a motion to reopen, there is no longer a final decision to review).

The BIA's sua sponte reopening of the immigration proceedings on 6 March 6 2006 rendered the BIA's 28 June 2005 order non-final, and deprived us of jurisdiction to review the petition that was pending at that time.  See AR at 228-29 (vacating its June 28, 2005, order).   Because we issued an opinion as to the 28 June 2005 affirmance, without having any order over which to exercise jurisdiction, we vacate and withdraw our 22 June 2006 opinion.


B. Substantial Evidence Supporting the BIA's Denials

Suharti argues that the aggregate harm she and her family suffered sufficed to establish persecution on account of their Chinese ethnicity and Christian religion

15

and that she has a reasonable fear that she will suffer future persecution if she returns to Indonesia.

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the Board adopts the IJ's reasoning, we review the IJ's decision as well." Id. In this case, the BIA agreed with the reasoning of the IJ as to the finding of past and future persecution. We will, therefore, review both the IJ's and the BIA's decisions. See id.

"We review the IJ's and the BIA's factual determinations under the substantial evidence test, and . . . will affirm [if the decision] is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quotation and citation omitted). We review the record evidence in the light most favorable to the BIA's decision. Forgue v. U.S Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). Moreover, we may not overturn the BIA's findings of fact "unless the record compels it." Id. at 1287 (quotation and citation omitted).

An alien is eligible for discretionary asylum relief if the alien is a refugee within the meaning of 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). A refugee is defined as

> any person who is outside any country of such person's nationality . . .
> and who is unable or unwilling to return to, and is unable or unwilling

16

> to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42)(A). The asylum applicant bears the burden of proving that he qualifies as a "refugee." 8 C.F.R. § 208.13(a). In order to meet this burden, "the applicant must, with specific and credible evidence, establish (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground." Mejia, 498 F.3d at 1256.

"To establish asylum based on *past* persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007) (quotation and citation omitted); 8 C.F.R. § 208.13(b)(1). An applicant may establish asylum based on a well-founded fear of future persecution by demonstrating (1) past persecution that creates a rebuttable presumption of a well-founded fear of future persecution based on a protected ground, (2) a reasonable possibility of personal persecution based on a protected ground, or (3) a pattern or practice in the subject country of persecuting a group of similarly situated people, to which the petitioner belonged, on account of a protected ground. 8 C.F.R § 208.13(b)(1), (b)(2)(I) and (iii). In establishing a reasonable fear based on any of the above showings, the alien must demonstrate that his fear "is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289.

17

"The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1007 (11th Cir. 2008) (quotation omitted). "The objective prong can be fulfilled by establishing that the applicant "has a good reason to fear future persecution." Id. (quotation and citation omitted).

An alien seeking withholding of removal must show "that it is more likely than not that she will be persecuted or tortured upon being returned to her country." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11 Cir. 2005) (per curiam). This standard is more stringent than the standard for asylum. Id. An alien who fails to establish eligibility for asylum generally cannot satisfy the higher burden for withholding of removal. Id. at 1232-33.

Neither the INA nor the regulations define "persecution," but we recognize that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Id. at 1231 (quotations, alteration, and citation omitted). Moreover, "[n]ot all exceptional treatment is persecution." Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000). For applicants seeking derivative asylum status, "the principal applicant must first establish entitlement to asylum in his own right[.]" In re A-K-, 24 I.&N. Dec. 275, 279 (BIA 2007).

18

Suharti's persecution claim was based on six incidents, three of which involved her: (1) at age fifteen, she as accosted by two native-Indonesian men and told to return to China; (2) in July 2001, she was pushed to the ground during an attempted robbery, inducing the premature birth of her son, and (3) in December 2001, her mother was robbed. The other three incidents only involved Suryadi and occurred in 1998 before his relationship with Suharti: (4) the robbery and burning of Suryadi's store, and attack on Suryadi by a man yelling "kill all the Chinese;" (5) the burning of his church; and (6) the attack on his home and killing of his dog.

Although the IJ discounted the 1998 looting incident because it did not involve Suharti, and did not discuss the incidents involving the burning of Suryardi's church or the attacks on his house or dog, or the killing of his dog, these events do not establish that she suffered persecution. See In re A-K-, 24 I.&N. Dec. at 278-79 (claims of persecution based on harm to family members absent a pattern of persecution tied to the applicant personally). Neither the 2001 robbery of her mother nor the attempted robbery which resulted in her son's premature birth establish past persecution because there is no evidence of a nexus between these acts and a protected ground. See Sanchez Jimenez, 492 F.3d at 1232 (applicant must show motivation based on a protected ground). The incident in which she was accosted as a teenager does not arise to the level of persecution because, although offensive and extreme, it was an isolated mistreatment. See

19

Gonzalez, 212 F.3d 1355 (not all offensive or exceptional treatment is persecution). The evidence also does not compel the conclusion that Suharti established a well-founded fear of future persecution. Suharti and Suryadi traveled between Taiwan and Indonesia and voluntarily remained in Indonesia before traveling to the United States. Suharti's mother, a Chinese Christian, continues to reside in Surabaya and to operate Suryadi's store without incident. The IJ's decision to deny Suharti's application for asylum and withholding of removal, affirmed by the BIA, is supported by substantial evidence and the evidence does not compel an alternate conclusion. Substantial evidence supports the conclusion that she neither suffered past persecution nor has a reasonable fear of future persecution. Accordingly, we deny Suharti's petition with respect to her asylum and withholding of removal claims.

## III. CONCLUSION

Because substantial evidence supports the IJ's denial of Suharti's application for asylum and withholding of removal and does not compel an alternate conclusion, we deny Suharti's petition.

**PETITION DENIED.**