FILED
United States Court of Appeals
Tenth Circuit

August 15, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

KAREL ADAM; IVONNE UMBOH;
RONALDO ADAM,

        Petitioners,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

        Respondent.

No. 14-9508
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **PORFILIO**, and **MATHESON**, Circuit Judges.

---

Petitioners, Indonesian citizens and natives, seek review of a Board of

Immigration Appeals (BIA) decision dismissing their appeal from the Immigration

Judge's (IJ) denial of Karel Adam's application for asylum, restriction on removal,

and relief under the Convention Against Torture (CAT). Exercising jurisdiction

under 8 U.S.C. § 1252(a)(1), we deny the petition.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. BACKGROUND

Petitioners entered the United States in June 2000 as nonimmigrant visitors. Their authorization to remain expired in December 2000. In 2003, Mr. Adam applied for asylum based on his political opinion and membership in a political opposition group – FKM-USA. The other Petitioners, his wife and son, are derivative applicants.[1] The Department of Homeland Security denied the asylum request and placed the Petitioners in removal proceedings.

The IJ explained a delay in the proceedings from 2003 to 2010: "Proceedings in this matter changed venue multiple times between Los Angeles and Denver until this Court denied further motions to change venue and required the [Petitioners] to appear at a master calendar hearing." Admin. R. at 124. At that hearing, Mr. Adam said he would file a new asylum application, which he did in November 2010. The new application alleged fear of persecution based on the Petitioners' Christian religion.

At the merits hearing in 2012, Mr. Adam disavowed his 2003 asylum application as inaccurate. He then testified as follows. Mr. Adam is a lifelong Seventh Day Adventist. He met and married his wife, Ivonne Umboh, during

---

[1] Mr. Adam's daughter, Thalia, was originally a derivative applicant. During the proceedings, however, she reached adult age and filed a separate application for asylum and restriction on removal. The cases were consolidated for the merits hearing. During the appeal to the BIA, Thalia moved to sever to allow her to pursue adjustment of status based on her marriage to a United States citizen. The BIA granted the motion. Thalia is no longer a party to these proceedings.

college.  In 1998, when living in Jakarta, Mr. Adam decided to transfer their daughter, Thalia, from public school to a Seventh Day Adventist school so she could "learn more about [her] own religion," *id*. at 191, and avoid conflict over whether she could be excused from Saturday morning classes to participate in "religious activities," *id*. at 192.  According to Mr. Adam, the public school headmaster suggested Thalia engage in religious activities on Saturday afternoons.  Mr. Adam rejected the suggestion and decided to transfer Thalia.

In April 1998, an after-school clash occurred between students at the public and Seventh Day Adventist schools.  Mr. Adam testified, "Every day I had to pick up my kids from school.  When I was parking the car in front of the school I saw [the Seventh Day Adventist students] getting out [of] school . . . . [T]here were 50 other kids behind them . . . and they were all wearing [public school] uniforms."  *Id*. at 194.  The public school students "started hitting the [Seventh Day Adventist] high school children."  *Id*.  Mr. Adam got his daughter into the car but could not leave before someone hit the rear window with a baseball bat.  He also witnessed "a few kids who [got] beaten up."  *Id*. at 197.  The police were called and "came to disperse the crowd."  *Id*. at 238.  That evening he learned that two Seventh Day Adventist students were killed in the melee.  Mr. Adam did not report the damage to his car to the authorities.  Thalia stayed home from school the following week.  "[B]ecause of the incident the Adventist school took a step to change the schedule so they started

early and finished . . . early." *Id*. at 195. A few months later, Mr. Adam moved his family from Jakarta to Mataram.

Because there were no Seventh Day Adventist schools in Mataram, Mr. Adam enrolled Thalia in a Catholic school. His family worshipped at a Seventh Day Adventist church without interference. Things were peaceful until early 2000, when three men accosted Thalia on a bus. They spit on her and burned the symbol of a cross on her arm with a cigarette. Mr. Adam was away from home that day. His wife told him she did not take Thalia to the doctor because she was "afraid." *Id*. at 205. Mr. Adam decided to treat the wound at home and did not call the police or seek outside medical care. He did not know the men who committed the assault. He testified it would have been futile to file a police report because "[b]ased on the history that had happened to other Christians and to my close friends the police [would] not do anything." *Id*. at 249.[2]

A few days later, eight Christian churches in Mataram were burned down, including the Seventh Day Adventist church. Mr. Adam had no idea "who was behind all this stuff, but the situation was very heated, especially because [several churches had also been burned down] in Jakarta." *Id*. at 208. A few weeks later, Mr. Adam quit his job and the family moved back to Jakarta, where he spent the next three months looking for work and Thalia refused to return to school.

---

[2] This testimony conflicts with Mr. Adam's earlier statement that police came and dispersed the crowd at the school incident.

Although still able to attend church, Mr. Adam and his family left Indonesia for the United States. "I basically came to the United States . . . to live . . . temporarily until . . . my family was feeling safe." *Id*. at 214. Plans changed, however, when relatives in Indonesia warned Mr. Adam not to return because "the situation in Indonesia was getting worse," *id*. at 215. He admitted, however, that none of his relatives, all of whom are Christians, have been harmed or threatened. Still, he cited instances in Jakarta and Java, "[m]ost of them [not reported] by the media," of Muslims attacking Christians. *Id*. at 243.

Thalia testified to the same events her father described, and confirmed the details. Like her father, she feared returning to Indonesia because Christians are "not able to freely express . . . freedom [of] religion and the police are just standing by[,] just watching." *Id*. at 275-76.

The IJ denied relief. He found Mr. Adam and Thalia credible and the 2003 asylum application not frivolous. But he found Petitioners ineligible for asylum because the application was not filed within one year of their arrival in the United States and no changed or extraordinary circumstances excused the untimely filing. He also concluded Petitioners were not eligible for restriction on removal or CAT protection.

The BIA dismissed the appeal. It agreed with the IJ that the 2003 asylum application was untimely. It also agreed Petitioners are not entitled to restriction on removal or CAT protection.

## II. **DISCUSSION**

The BIA issued a single board member's brief order, so we review it as the final order of removal but "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007). "In this circuit, the determination whether an alien has demonstrated persecution is a question of fact." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011) (ellipses omitted) (internal quotation marks omitted). The burden to obtain a reversal is steep because, "in reviewing the BIA's factual findings, we are bound by Congress's directive that 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Barrera-Quintero v. Holder*, 699 F.3d 1239, 1244 (10th Cir. 2012), quoting 8 U.S.C. § 1252(b)(4). We review the agency's legal conclusions de novo. *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005).

This appeal concerns only the denial of restriction on removal.[3] "To obtain restriction on removal, the alien must demonstrate that [his] 'life or freedom would be threatened in [the proposed country of removal] because of [his] race, religion, nationality, membership in a particular social group, or political opinion.'" *Tulengkey*, 425 F.3d at 1280 (quoting 8 U.S.C. § 1231(b)(3)(A)).

---

[3] Petitioners do not appeal dismissal of their asylum request. They waived review of the denial of CAT protection by failing to raise this issue in their opening brief.

> An alien may create a rebuttable presumption of eligibility for restriction on removal by either (1) demonstrating past persecution in the proposed country of removal on account of one of the protected grounds; or (2) showing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds upon returning to the proposed country of removal.

*Sidabutar v. Gonzales*, 503 F.3d 1116, 1123-24 (10th Cir. 2007) (citations and internal quotation marks omitted).

"Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive, and must entail more than just restrictions or threats to life and liberty." *Ritonga*, 633 F.3d at 975 (internal quotation marks omitted). "We do not look at each incident in isolation, but instead consider then collectively, because the cumulative effects of multiple incidents may constitute persecution." *Id.*

## A. *Past Persecution*

As to past persecution, what Mr. Adam described in his testimony is regrettable and troubling, but our precedent makes it difficult for Petitioners to prevail. Even when an alien "suffered repeated robberies and some minor injuries," we have upheld a finding of no past persecution. *Sidabutar*, 503 F.3d at 1124. Similarly, we have said "[an alien's] descriptions of . . . riots and . . . church burning[s] do not mandate relief." *Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009). Here, the IJ found, and the BIA agreed, that Mr. Adam did not show enough under applicable precedent that he was the victim of harm or suffering and therefore did not establish past persecution. Based on the record, our limited and

- 7 -

demanding standard of review, and binding precedent, we cannot conclude that any reasonable adjudicator would be compelled to reach a contrary determination.

## B. *Future Persecution*

As to future persecution, an applicant can qualify for restriction on removal by establishing that "it is more likely than not that he . . . would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country." 8 C.F.R. § 1208.16(b)(2); *see also Witjaksono*, 573 F.3d at 977 (same). An applicant must demonstrate a "clear probability of persecution." *Elzour v. Ashcroft*, 378 F.3d 1143, 1149 (10th Cir. 2004). For a fear of future persecution to be well-founded, it must be both subjectively genuine and objectively reasonable." *Ritonga*, 633 F.3d at 976.

An applicant can establish an objectively reasonable fear by showing (1) it is likely he or she would suffer persecution due to being part of a group that has suffered a pattern or practice of religious persecution, or (2) that he or she likely would be singled out for persecution. *See* 8 C.F.R. § 1208.16(b)(2). As to either (1) or (2), "the persecution must be committed by the government or forces the government is unwilling to control." *Neri-Garcia v. Holder*, 696 F.3d 1003, 1009 (10th Cir. 2012) (internal quotation marks omitted). Mr. Adam's application fails on this latter requirement, and we therefore do not address (1) or (2).

The IJ found, and the BIA agreed, that Mr. Adam did not establish that his fear was "objectively reasonable." Under our strict standard of review, we conclude the

IJ reasonably found Mr. Adam did not show acts committed by the Indonesian government or a group that the government is unwilling or unable to control. Further, the evidence showed Mr. Adam and his family were able to attend church until they left Indonesia, Indonesia's constitution protects religious freedom, and his relatives in Indonesia have continued to attend a Seventh Day Adventist church without harm. This evidence counters Mr. Adam's alleged fear of future persecution. *See*, *Ritonga*, 633 F.3d at 977. We cannot conclude any reasonable adjudicator would be compelled to reach a determination on fear of future persecution contrary to the IJ's.[4]

The petition for review is denied.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

---

[4] Petitioners urge this court to adopt the "disfavored group" analysis employed by the Ninth Circuit in *Sael v. Ashcroft*, 386 F.3d 922, 925-29 (9th Cir. 2004). But Petitioners failed to raise this issue with the BIA, and we therefore lack jurisdiction to consider it. *See* 8 U.S.C. § 1252(d)(1) (requiring administrative exhaustion as a jurisdictional prerequisite); *see also Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (same).